**18LIN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) QuiBids LLC | ) | |
| (2) QuiBids Holdings LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. CIV-13-419-HE |
| | ) | |
| (1) Louis Carbonneau | ) | |
| (2) Tangible IP LLC | ) | |
| (3) Leigh M. Rothschild | ) | |
| (4) Ariel Inventions, LLC | ) | |
| (5) Atanu Das | ) | (Jury Trial Demanded) |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs QuiBids LLC and QuiBids Holdings LLC (jointly, "QuiBids") for their complaint against Defendants Louis Carbonneau, Tangible IP LLC, Ariel Inventions, LLC, Leigh M. Rothschild, and Atanu Das allege as follows:

## NATURE OF THIS ACTION

1.     The Defendants have engaged in a complex conspiracy to use two fraudulently obtained U.S. patents in an effort to acquire a monopoly in the online penny auction industry and to extort money from QuiBids and others in the industry through the assertion of objectively baseless claims of patent infringement.

2.     This is a civil action brought under Federal and Oklahoma law against Defendants for violation of the Federal Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*., violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, declaratory judgment of non-infringement, invalidity, unenforceability, and misuse of two  patents pursuant

to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2201, and the United States Patent Law, 35 U.S.C. §100 *et seq.*, unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125, violation of the Oklahoma Antitrust Reform Act, 79 Okl. St. §201 *et seq.*, violation of the Oklahoma Deceptive Trade Practices Act, 78 Okl. St. §51 *et seq.*, and unfair competition and tortious interference with prospective business advantage in violation of Oklahoma law.

## PARTIES

3.      Plaintiff QuiBids LLC is an Oklahoma limited liability corporation having a principle place of business in Oklahoma City, Oklahoma.  Plaintiff QuiBids Holdings LLC is a Delaware limited liability corporation having a principle place of business in Oklahoma City, Oklahoma.

4.      Defendant Louis Carbonneau ("Carbonneau") is an individual and a citizen of Canada.  Carbonneau is the founder and CEO of Tangible IP, LLC.

5.      Defendant Tangible IP, LLC ("Tangible") is a Washington corporation and holds itself out as having offices in Seattle, Washington, San Francisco, California, and Montreal, Quebec Canada.

6.      Defendant Ariel Inventions, LLC ("Ariel") is a Florida corporation, having a principal place of business at 1108 Kane Concourse 310, Bay Harbor Islands, Florida, 33154 according to the Florida Secretary of State's online incorporation database.

7.      Defendant Leigh M. Rothschild ("Rothschild") is an individual and a resident of the State of Florida.  Rothschild is the founder and CEO of Ariel.

8.      Defendant Atanu Das ("Das") is an individual and a resident of the State of Illinois. Das is a registered patent attorney and prosecuted the patents at the core of this complaint.

## JURISDICTION AND VENUE

9.      This court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §

1331, 1332, 1338(a) and (b), 2201 and 2202; and the Patent Laws of the United States, 35 U.S.C.

§ 1, et seq.  This Court has subject matter jurisdiction over QuiBids' claims for violation of the

RICO Act pursuant to 18 U.S.C. § 1961 et seq.  This Court has further supplemental jurisdiction

over QuiBids' claims under Oklahoma law pursuant to 28 U.S.C. § 1367(a).

10.     Personal jurisdiction and venue is proper in this district pursuant to 28 U.S.C. §

1391, because QuiBids resides in this district and because a substantial part of the events giving

rise to its claims occurred in this district.  This Court further has personal jurisdiction over the

Defendants pursuant to 18 U.S.C. § 1965(a) and (b).  Personal jurisdiction is further proper over

the Defendants pursuant to 12 Okl. St. 2004(F) for at least the reason that Defendants, through

their authorized agent and co-conspirator Louis Carbonneau, have transacted business,

committed an overt act in furtherance of the Defendants' conspiracy, committed  tortious

conduct, caused harm, and directed their activities in and to the State of Oklahoma.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and 18

U.S.C. § 1965(a).

## A BRIEF HISTORY OF ONLINE PENNY AUCTIONS

12.     Online auctions have existed in various forms since as early as the late 1970's,

long before the advent of the World Wide Web, when primitive auctions were conducted on

early Internet Bulletin Board Services.  Modern online auctions began in 1995 with the launch of

AuctionWeb, which is now known as eBay.

13.     The penny auction industry was born in September 2005, when a company named

Telebid launched in Germany.  Penny auctions are distinct from traditional online auctions in

that bidders pay for each bid placed.  Telebid users were initially required to phone-in bids, but the site was later modified to allow users to place bids through a web browser.  In 2008, Telebid changed its name to Swoopo and expanded to several other countries, including the United States and the U.K.  A number of other penny auctions have been launched in the United States, including QuiBids, DealDash, BigDeal, BidCactus, BidRivals, and Beezid.

14.     A key factor to the success of any online penny auction operation is the ability to retain customers while attracting new customers.  The feature that has proven most successful in effecting customer retention is referred to in the industry as either "Buy It Now" or "Buy Now." This feature provides the unsuccessful bidder with the opportunity to recoup the money spent in participating in the auction by purchasing the auctioned product at its established retail price less the amount paid for the bids.   This feature was implemented by QuiBids when it launched its online penny auction in October 2009, and was quickly adopted by other online penny auction operators.  Presently, nearly every successful operator in the industry uses this feature and its use has resulted in the enormous growth of penny auctions in the United States.

## THE ONLINE PENNY AUCTION MARKET

15.     According to allpennyauctions.com, a company that tracks the online penny auction market, there are currently 590 active online penny auction sites in the United States.

16.     As a part of the Defendants' ongoing efforts to solicit offers to purchase the fraudulently obtained patents, Carbonneau has distributed an "executive summary," a true and correct copy of which is attached as Exhibit 1 hereto, in which he made representations about the growing size and lucrative nature of penny auction industry. For example, Carbonneau has stated:

Online penny auction tracker, allpennyauctions.com, reports that from January 1 – 8, 2013, 45 firms  accounted for 52,860 closed auctions in the penny auction industry.  The top  four firms <u>accounted for</u> 42,420, or 80% of those auctions:  QuiBids (28,355), DealDash (6,738), BidCactus (4,137), and Beezid (3,190).  In only one week of running penny auctions, these top firms generated almost $5.2 million in consumer bidding revenue, approximately  80% of the industry.  In addition, the top four online penny auction firms get almost 1 million  pageviews per day, with annual net traffic worth and advertising revenue of over $2 million on top of the revenue  from auctions.  This activity places the US penny auction industry at a pace of annual revenues exceeding US $350M.  Penny auction companies have reported large profit margins, which are also assisted by relatively low operating costs.

Exhibit 1, p. 8.

## QUIBIDS' ONLINE PENNY AUCTION BUSINESS

17.     QuiBids, launched its online penny auction website, www.quibids.com, in October 2009.  QuiBids' online penny auction differs from traditional online auctions such as eBay in several different ways:

(a)     In a traditional online auction, the auction site permits third party sellers to register with the site and then sell their products to only the winning bidder.  In contrast, QuiBids' online auction permits multiple products to be purchased by different participants in the same auction, and

(b)     QuiBids does not permit third-party sellers to register with their site.  Instead, QuiBids offers new products that are factory sealed rather than previously used and/or owned products.

18.     For example, QuiBids may offer a particular model of a laptop computer in one of its auctions that has a retail price of $500.00.  To participate in the QuiBids online auction, the prospective bidder logs on to QuiBids' website, <u>www.quibids.com</u>, where a prospective bidder can purchase "bids" at a price of sixty cents ($0.60) each.  Any number of potential auctions for

a variety of products are available for participation by the prospective bidder, including the laptop computer, once the prospective bidder has logged onto the QuiBids website.

19.     Each participant in the auction may place bids for the laptop computer.  Each bid increases the actual price at which the laptop computer will eventually be available for purchase by the highest bidder by one cent.  If a bid is placed with less than 20 seconds remaining on the timer, the timer is reset to up to 20 seconds, and the other participants in the auction will have the opportunity to place further bids on the item.

20.     If the timer reaches zero before a new bid has been placed, the last successful bidder can then purchase the laptop computer for the final auction price.  For purposes of illustration only, if a total of 1000 bids have been placed during the auction for the laptop computer when the timer reaches zero, the final bidder may purchase the laptop for $10.00 (1000 bids x $0.01 per bid).

21.     QuiBids' ability to compete in the penny auction industry is due in significant part to its "Buy Now" feature, which has been a part of QuiBids' online penny auction since its introduction in October 2009.  By selecting the "Buy Now" feature on QuiBids' auction site, an unsuccessful bidder is given a credit towards the purchase price of the product, e.g. the $500 laptop computer.  This credit is calculated by the number of bids placed by that bidder multiplied by the cost of the bid.  Thus, if an unsuccessful bidder placed 200 bids, for which he had paid $120.00 (200 bids x $0.60 per bid) he would receive a credit of $120.00 towards the $500.00 purchase of the laptop computer. The "Buy Now" feature has proven to be a significant contributor to the overall success of QuiBids' business.   QuiBids' ability to provide the "Buy Now" feature is, therefore, essential to its ability to successfully compete in the penny auction industry.

## THE ROTHSCHILD PATENT PORTFOLIO

### U.S. Patent No. 8,090,623

22.     Rothschild is listed as the sole inventor on U.S. patent no. 8,090,623 (the "'623 patent") entitled "METHOD AND SYSTEM FOR CONDUCTING AN AUCTION OVER A NETWORK."  The application that matured into the '623 patent was filed on September 4, 2007. The '623 patent issued on January 3, 2012.  Ariel claims to be the owner of the '623 patent.   A true and correct copy of the '623 patent is attached as Exhibit 2 hereto.

23.     Das, a registered patent attorney, prosecuted the application for the '623 patent on Rothchild's behalf before the United States Patent and Trademark Office ("USPTO").

### U.S. Patent Application Publication No. 2012/0197703

24.     Rothschild is listed as the sole inventor on U.S. patent application publication number 2012/0197703 (the "'703 application") entitled "METHOD AND SYSTEM FOR CONDUCTING AN AUCTION OVER A NETWORK," which was published on August 2, 2012. Ariel claims to be the owner of the '703 application.   A true and correct copy of the '703 application is attached as Exhibit 3 hereto.

25.     The '703 application was filed as a continuation-in-part application of the '623 patent.

26.     Upon information and belief, Das has been and is currently prosecuting the '703 application on Rothchild's behalf before the USPTO.

**U.S. Patent No. 8,374,919**

27.     Rothschild is listed as the sole inventor on U.S. patent no. 8,374,919 (the "'919 patent") entitled "METHOD AND SYSTEM FOR CONDUCTING AN AUCTION OVER A NETWORK," which issued on February 12, 2013.  Ariel claims to be the owner of the '919 patent.   A true and correct copy of the '919 patent is attached as Exhibit 4  hereto.

28.     The '919 patent was filed as a continuation of the '703 application.

29.     Das prosecuted the application for the '919 patent on Rothchild's behalf before the USPTO.

**U.S. Patent No. 8,380,581**

30.     Rothschild is listed as the sole inventor on U.S. patent no. 8,380,581 (the "'581 patent") entitled "METHOD AND SYSTEM FOR CONDUCTING AN AUCTION OVER A NETWORK," which issued on February 19, 2013.  Ariel claims to be the owner of the '581 patent.   A true and correct copy of the '581 patent is attached as Exhibit 5 hereto.

31.     The '581 patent was filed as a continuation of the '703 application.

32.     Das prosecuted the application for the '581 patent on Rothchild's behalf before the USPTO.

## BACKGROUND OF U.S. PATENT AND ANTITRUST LAWS

33.     The United States' antitrust laws generally prohibit monopolization and attempts to monopolize trade, *i.e.*, the exclusive possession or control of the supply or trade of a good or service in a particular market.  As the basis of a free market economy, these laws are necessary and fundamental to enable competition to flourish.

34.     However, the United States also recognizes the importance of granting inventors patents, *i.e.*, exclusive rights to new inventions.  U.S. Const., Art. I, sec. 8.  Patents in the United

States are governed by the Patent Act, Title 35 of the United States Code, which established the USPTO, grants inventors a limited monopoly on any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof.

35. To obtain a patent, the inventor(s) must submit a patent application to the USPTO, where it will be reviewed by an examiner(s) to determine if the invention(s) described and claimed therein are patentable.

36. To assist the USPTO in its mission to issue only valid patents, individuals associated with a patent application have a duty of candor and good faith (See 37 C.F.R. § 1.56) in dealing with the USPTO, including a duty to disclose all information known to be material to patentability of the invention.

37. If a valid patent is granted, a patent owner may stop others from violating the exclusionary rights provided by his patent. A patent owner may also license others to engage in conduct that might otherwise be a violation of the patent.

38. To the extent that one is engaged in conduct permitted by the United States' patent laws, one is immunized from antitrust laws. However, one who seeks to obtain a benefit from the patent system by knowingly enforcing or attempting to enforce an invalid patent, loses the shield against antitrust laws and can be found to have engaged in unlawful monopolization. See *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp,*, 382 U.S. 172 (1965).

**DEFENDANTS' CONSPIRACY TO ATTEMPT TO MONOPOLIZE
THE ONLINE PENNY AUCTION MARKET AND TO EXTORT MONEY FROM
ONLINE PENNY AUCITON OPERATORS**

39.     At least as early as June 28, 2012, the Defendants entered into a conspiracy -- the object of which was to (a) obtain fraudulently procured patent coverage over the "Buy Now" feature used by QuiBids in connection with its online penny auction operation and numerous other competing online penny auction operators, and (b) use such fraudulently procured patents to attempt to (i) gain a monopoly over the online penny auction market and (ii) extort money from QuiBids and its competitors by placing them in the untenable position of having to either purchase the patents or face the prospect of being subjected to objectively baseless, but potentially ruinous  patent litigation.

40.     The problem faced by the Defendants was that the "Buy Now" feature had been in wide-spread prior public use by QuiBids and others since at least as early as 2009.

41.     As of June 28, 2012, however, none of the Defendants held title to any patent that claimed or even described the use of the "Buy Now" or an equivalent feature in connection with the operation of an online penny auction.

42.     Ariel  is the owner of the '623 patent.

43.     Ariel  is also the owner of the '703 application.

44.     Unfortunately for the Defendants, the claims of the '623 patent could not be asserted against QuiBids or the other online penny auction operators.  The '623 patent neither disclosed nor claimed the use of the "Buy Now" or equivalent feature.  Nor could Defendants expect the '703 application to provide the necessary patent claims if and when it ultimately issued.  As with the '623 patent, the '703 application neither disclosed nor claimed  the use of the "Buy Now" or equivalent feature in connection with an online penny auction.

10

**Defendants Fraudulently Acquire
U.S. Patent Coverage for the "Buy Now" Feature**

45.     Since neither the '623 patent nor the '703 application disclosed or claimed the use of the "Buy Now" feature in connection with an online penny auction, the Defendants understood that the success of their conspiracy lay in securing patent claims to the "Buy Now" feature that they could then use to falsely accuse QuiBids and other online penny auction operators of patent infringement.

46.     To accomplish this goal, Rothschild and Das filed two new applications in 2012 with the USPTO.   Both applications were filed as continuation applications of the '703 application which, as previously stated, was filed as a continuation-in–part application of the '623 patent.

47.     The first application was filed by Das on June 28, 2012, and identified Rothschild as the sole inventor.   This first application was filed as a continuation application of the '703 application.   This first application eventually issued as the '919 patent.

48.     The second application was filed by Das on August 13, 2012, and also identified Rothschild as the sole inventor.   This second application was also filed as a continuation application of the '703 application.   This second application was eventually issued as the '581 patent.

49.     Rothschild assigned title to the two patent applications to Ariel on the same date that each application was filed which, according to Carbonneau, was to "consolidate all assets of this portfolio under the same ownership to make a sale simpler."

50.     Pursuant to 37 C.F.R. § 1.56, Rothschild and Das owed a duty of candor and good faith in their dealings with the USPTO in connection with the prosecution of the '919 and '581

patents, including the duty to disclose all information known by them to be material to the patentability of the claimed invention(s).  Rothschild and Das knowingly breached their duty of candor to the USPTO in connection with the filing of the applications for the '919 and '581 patents in the following regards.

(a)     By filing each of the two applications as "continuation applications" rather than as a "continuation-in–part applications" they misrepresented to the USPTO that the application included only matters that had already been disclosed in the '703 application.  In fact, there is no disclosure or claim pending in the '703 application regarding the "Buy Now" feature, a fact known to both Rothschild and Das.

(b)     By failing to disclose their knowledge of the wide-spread public use of the "Buy Now" feature that dated back to at least as early as 2009.

51.     Thus, Rothschild and Das, acting with the intent to deceive, (a) misled the USPTO regarding the proper priority date when filing the applications that matured into the '919 and '581 patents, and (b) failed to disclose material prior art of which they were aware that bore directly on the patentability of their interpretation of the claims of the'919 and '581 patents.  But for such conduct, the claims of the '919 and '581 patents would not have been granted.

52.     The actions taken by Rothschild and Das were overt acts taken to further the Defendants' conspiracy.

**Defendants' Efforts to Monopolize the Online Penny Auction Market
and to Extort Money from  QuiBids and Other Online Penny
Auction Operators Who Use the "Buy Now" Feature**

53.     Having achieved the first step of their conspiracy by having fraudulently procured

the claims of the '919 and '581 patents, Defendants commenced their efforts to gain a monopoly

over the online penny auction industry and to illegally extort money from QuiBids and others in

the online penny auction industry by accusing them, in bad faith, of infringing the '919 and '581

patents.

54.     As set forth in detail below and upon reliance of the presumptive validity that is

accorded to issued U.S. patents, there exists a dangerous probability that the assertion of the

fraudulently obtained '919 and '581 patents by Ariel, Tangible, or any purchaser of these

patents, against QuiBids and/or other online penny auction operators will lessen or destroy

competition in the online penny auction market.

55.     In an email sent to QuiBids on March 7, 2013, Carbonneau identified himself as

CEO of Tangible and advised that

> I am the former GM, IP Licensing at Microsoft and now the CEO of Tangible IP, LLC, a
> premiere patent brokerage firm focusing on high quality patents with over 1500 assets
> sold.  I currently have a portfolio that I think might be of interest to your company.
>
> Tangible IP, LLC, which I founded, has been retained exclusively as the agent to divest
> several patent assets of Ariel Inventions, LLC in the area of online coupons and auctions.
> This is a very relevant portfolio with easy to prove Evidence of Use (EoU), numerous
> claim charts against some of your main competitors, and no encumbrances. It has also a
> lot of room to grow as valuation goes, and the pricing guidance before vs. after issuance
> of the 4th asset reflects this.  Since allowance of the pending application should occur in a
> matter of months, even possibly weeks, time if [*sic*] of the essence and there is a short
> term window for the opportunistic buyer to acquire this portfolio at a significantly lower
> price point relative to its full potential value.  The seller is also open to a deal structure
> that would entail both an upfront payment and a back end component.

I am sending you a redacted executive summary where one of the corresponding claim charts has been left out for obvious reasons.  Please let me know if you want to have access to the last claim chart.  You can also call me to discuss in more detail.

56.     The "executive summary" provided by Carbonneau, a true and correct copy of which is attached as Exhibit  6 hereto, lays out in graphic detail the "Opportunity" that is available to a prospective buyer of the Rothschild Patent Portfolio to monopolize the online penny auction market:

Our company, Tangible IP, LLC, has been retained exclusively as the agent to divest several patent assets of Ariel Inventions, LLC in the area of online coupons and auctions.  This constitutes a unique opportunity for buyers wanting to acquire a strategic (***offensive and defensive***) position in many key areas, or for institutional buyers wanting to monetize this portfolio through licensing programs and/or ***assertion.***

Exhibit 6, p. 3. (emphasis added)

57.     Carbonneau indicates that the asking price for the Rothschild Patent Portfolio is:

$2 to $3 million in an all cash sale while the ['703 application] is still pending.  However, we anticipate our pricing guidance to essentially double (i.e. US $4 to $6 million) once said application is allowed with enforceable claims substantially similar to the amended claims filed recently by the seller.  Since allowance of said application should occur in a matter of months, even possibly weeks, time is of the essence and there is a short term window for the opportunistic buyer to acquire this portfolio at a significantly lower price point relative to its full potential value.  The seller is also open to a deal structure that would entail both an upfront payment and a back end component.

Exhibit 6, p. 17.

58.     Throughout the executive summary, Carbonneau plays up the strength of the '919 and '581 patents based upon their fraudulently obtained claims directed to the use of the "Buy Now" feature in connection with an online penny auction operation.  For example, under the heading "Over view [sic] of the Patent Portfolio," Carbonneau states "[t]he portfolio on offer consists of 3 issued US patents pertaining to 2 distinct and inherently large markets … ii) the

young and very fast growing penny auction market with market leaders such as ***Quibids***, DealDash and many others."  Exhibit 6, p. 3 (emphasis added)

59.     Carbonneau then provides a brief description of the scope of coverage afforded by each of the Rothschild Patent Portfolio.  With respect to the scope of coverage of the '919 and '581 patents, Carbonneau emphasizes "[t]he allowed claims are broader than on the original ['623] patent (see last element) to cover the ubiquitous "Buy It Now" [i.e., QuiBids' "Buy Now"] feature ***used by almost all online auctions companies*** and forms the basis for the various claim charts provided in support of this portfolio for all the online and penny auction scenarios." Exhibit 6, pp. 4-5. (emphasis added)

60.     Carbonneau also provides "Power Rankings" that are used to convince prospective buyers of the strength of the '919 and '581 patents and the ability to use them to monopolize the online penny auction market based upon the wide-spread and allegedly infringing use of the "Buy Now" feature.  Moreover, Carbonneau misrepresents the true priority date of the patents to further his claim that the patents will give the buyer a monopoly in the online penny auction market because the alleged priority date will immunize the buyer from any prior art challenges to the patents based upon the prior public use of the "Buy It Now" feature.

61.     These "Power Rankings" are broken into four categories:

    A.     Detectability of EoU [i.e., Evidence of Use ]

    Excellent.  ***It is extremely easy here to detect infringement of the patents*** ….
    [A]s the main features of the products that pertain to the portfolio on offer are
    well documented by the various infringers and are readily observable by
    accessing their respective websites.

    B.     Lack of Prior Art

    Very Good.  ***Because of its priority date of September 2007*** and the judicious use
    of backward citations, combined with a very young industry especially penny

auctions … which started in earnest in 2009 or later, the portfolio provides a very broad scope of coverage and excellent protection against invalidity findings in light of prior art existing at the time.

C.      Commercial Maturity

Very Good.  Although various markets targeted by this portfolio are relatively new, some of the basic features of the portfolio (e.g. "Buy It Now") are widely adopted and have become a fixture of the online auction world…. ___*7 out of 8 top penny auction sites offer the feature covered by the issued patents*___.

D.      Available Alternatives

Excellent.  Because of the breadth of the claims, there are very few non-infringing alternatives.  ___*As soon as an online auction site offers the ability to a losing bid auctionee to buy a duplicate item (Buy It Now), the patents on offer are being infringed*___.  There are currently no known alternatives used commercially.

Exhibit 6, pp. 6-7.

62.     Carbonneau then provides an historical and economic analysis of the online penny auction market, both generally and with respect to specific online penny auction operators, including QuiBids.  Citing allpennyauctions.com, Carbonneau entices prospective buyers by noting the enormous growth of the online penny auction market and asserts that "[t]his activity places the US penny auction industry at a pace of annual revenues exceeding US \$350M."  According to Carbonneau, "Twenty-three of 47 penny auction firms tracked by allpennyauctions.com offer Buy it Now features."  Exhibit 6, p. 9 .

63.     As set forth in the executive summary distributed by Carbonneau and Tangible and as a part of Defendants' efforts to entice prospective buyers to offer to purchase the Rothschild Patent Portfolio, Carbonneau made certain statements regarding QuiBids revenues and profitability.  Exhibit 6, pp. 8-9.

64.     As if the executive summary had not already made it perfectly clear, Carbonneau

drives home the point in a portion entitled "Relevance of the Portfolio to Various Markets."

Under the subheading "A) Online Auctions:" the report states:

> ***The Buy it Now feature, is at the core of the portfolio on offer***.  … penny auction firms
> offer Buy it Now features to maintain user activity over time, which is <u>key</u> for sustaining
> revenues and profits.  Penny auction firms seek to allay user fears over the cost of lost
> bids by offering the option to Buy it Now.  Penny auction firms that offer Buy it Now
> anticipate that users will take advantage of them.  Firms also offer Buy it Now features as
> a benefit to user's online shopping experience, even though their auction models do not
> create similar possibility of bid loss…. ***Of the top 8 penny auction firms operating in the
> US, seven now provide Buy It Now functionality*** (Beezid.com, BidCactus.com,
> BidRail.com, DealDash.com, ibid2SAVE.com, OrangeBidz.com, QuiBids.com).
> Additionally, PennyGrab.com, with an estimated $1.1 million in annual bid revenue
> offers Buy it Now to users.

Exhibit 6, pp. 14-15. (emphasis added)

65.     Under the heading "Evidence of Use," Carbonneau asserts:

The portfolio on offer is practiced by most of [*sic*] not all of the industry leaders in no
less than 3 major verticals (i.e. penny auctions, online auctions and online coupons), as
reflected in the 11 following claim charts.  All charts were prepared after extensive
review by Mr. Atanu Das, the same USPTO registered patent attorney who drafted and
prosecuted the patents on offer, therefore with full knowledge of any inherent limitation
of the assets and their corresponding file history."

Exhibit 6, pp. 15-16.

66.     Under the heading "Penny Auctions," Carbonneau then identifies the targets of

the claim charts that Das had prepared.  The first target is unidentified and is shown in the report

as "*[REDACTED.]*"   The other three targets of Das' claim charts are identified as DealDash,

BidCactus, and HappybidDay.  Exhibit 6, p. 16.

67.     Carbonneau included the redacted executive summary along with three claim

charts detailing the manner, using an element-by-element analysis, in which online penny

17

auction operators BidCactus, DealDash, and HappybidDay purportedly infringed various claims of the '919 patent, although none of the claim charts were directed at QuiBids.

68.     Carbonneau left no doubt that the claim chart shown as "[REDACTED]" was directed at QuiBids when, as he stated in his email to QuiBids: "one of the claim charts has been left out for obvious reasons.  Please let me know if you want to have access to the last claim chart."

69.     It is also apparent that Carbonneau has sent similar threatening emails to BidCactus, DealDash, and HappybidDay, in which he likely excluded "for obvious reasons" the claim chart directed to the recipient of the email, but included the claim charts for its "main competitors," including QuiBids.

70.     Moreover, Carbonneau left no doubt that he was accusing QuiBids of infringing the '919 and '581 patents.  Notwithstanding the fact that Carbonneau does not directly accuse QuiBids of infringement in his first email to QuiBids or in the executive summary, such an accusation is made indirectly.  As is stated on page 7 of the executive summary, "[a]s soon as an online auction site offers the losing bid auctionee to buy a duplicate item (Buy It Now), the patents on offer are being infringed.   There are currently no known alternatives used commercially."  Exhibit 6, p. 7.

71.     More recently, Carbonneau made a direct threat against QuiBids when, in an email to QuiBids he stated:

> "….I wanted to let you know that the seller is giving itself until the end of this month to entertain any offer on the portfolio and any related licensing discussions.  After that date, this portfolio will likely be sent to an NPE [*i.e. a non-practicing entity - - or as it is sometimes referred to in the vernacular - - a "troll"*] or to a law firm for assertion.  **So this is your last chance** if you would like to engage into a discussion around acquiring these assets or discussion other options."

## COUNT I

## VIOLATION OF THE RACKETEER INFLUENCED
## AND CORRUPTORGANIZATIONS ACT (RICO)

72.    QuiBids incorporates by reference herein the allegations of the preceding paragraphs.

73.    Defendants, in any combination associated in fact, are an "enterprise," as defined in 18 U.S.C. § 1961(4) (referred to herein as the "Associated-in-fact Enterprise").  Specifically, the Defendants were and are a group that is associated in fact, constitute an ongoing organization, and function as a continuing unit.  This is due to their interconnected contractual and financial relationship, their common goal of attempting to sell the Rothschild Patent Portfolio, and their continuing and substantial interaction and involvement (including through individuals associated with the entities) as alleged herein.

74.    The Defendants were and are associated for the common purpose of engaging in a course of conduct, at least one aspect of which is attempting to sell the Rothschild Patent Portfolio through improper means.  The Defendants have threatened litigation against QuiBids and other online auction companies while knowing that the Rothschild Patent Portfolio is invalid and the patents included therein were obtained through improper means.  The association between the Defendants has longevity sufficient to permit them to pursue the purpose of the Associated-in-fact Enterprise, including, by virtue of their ongoing contractual and financial relationship, an alignment of interests and ongoing interactions.

75.    Defendants are "persons," as that term is defined in 18 U.S.C. § 1961(3), who, individually and collectively, conduct and direct the affairs of the Associated-in-fact Enterprise through a continuing pattern of unlawful conduct.

76.    The Associated-in-fact Enterprise engages in, and its activities have an effect on, interstate commerce in connection with *inter alia,* the Associated-in-fact Enterprise's business of acquiring patents known by the Associated-in-fact Enterprise to be invalid and unenforceable as a result of such patents having been acquired through the fraud of Rothschild and Das, such fraud consisting of intentionally misleading the Patent Office by wrongfully claiming priority of invention to September 4, 2007 even though the claims were not entitled to the September 4, 2007 priority date, and by the failure of Rothschild and Das during the prosecution of the '919 and '581 patent  to inform the USPTO of material, non-cumulative prior art of which they were aware.  Such prior art consisted of the prior public use, by at least as early as October 2009, of the "Buy Now" feature by QuiBids and numerous others in the online penny auction business.  Thus, such prior public use occurred more than one year prior to the filing of the applications on June 28, 2012 and August 13, 2012 that matured into the '919 and '851 patents.   Had such prior public use been disclosed to the USPTO, the claims of the '919 and '851 patents would have been disallowed.  Notwithstanding Rothschild's and Das' knowledge of the invalidating prior public use of the "Buy Now" feature, and, thus the Associated-in-fact Enterprise's  knowledge of the invalidity and unenforceability of the '919 and '581 patents, the Associated-in-fact Enterprise has accused QuiBids and others in the online penny auction business of infringing the Rothschild Patent Portfolio due to their use of the "Buy Now" feature.   The Associated-in-fact Enterprise has impliedly threatened QuiBids and others in the online penny auction business with the filing of objectively baseless patent infringement actions unless QuiBids or any one of the other online penny auction businesses agrees to purchase the Rothschild Patent Portfolio for between $2 million and $3 million.  Moreover, the Associated-in-fact Enterprise has threatened to double the asking price for the Rothschild Patent Portfolio when and if the claims set forth in the '703

patent publication are issued by the USPTO, an event that Carbonneau and Tangible IP have represented is sure to occur "in a matter of months, even possibly weeks."   Exhibit 6, p. 17.

77.     The foregoing actions of the Associated-in-fact Enterprise were undertaken without an objectively proper basis in fact or law and for the illegitimate purpose of bolstering the *in terrorem* effect of its efforts to secure substantial sums through the sale of the Rothschild Patent Portfolio.  The Associated-in-fact Enterprise has targeted online penny auction businesses in several states using the instrumentalities of interstate travel, interstate mailings, and interstate telephone calls in its efforts to threaten and coerce QuiBids and the other online penny auction business as described above, thus promoting Defendants' unlawful scheme.

78.     In violation of 18 U.S.C. § 1962(c), Defendants and those acting at their direction have conducted, controlled, and participated in the conduct of the Associated-in-fact Enterprise's affairs through a pattern of unlawful racketeering activity.

79.     The pattern of racketeering activity referred to herein consists of a variety of unlawful schemes which were and are specifically intended to and do use unlawful means and influence to enrich Defendants and others at the expense of QuiBids and others.  These unlawful schemes involved, for instance, acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively, extortion in violation of 18 U.S.C. § 1951, and using the mail or any facility in interstate commerce in aid of racketeering enterprises in violation of 18 U.S.C. §1952.

80.     As alleged herein, Defendants, individually and/or collectively, and through the conduct of the Associated-in-fact Enterprise, are engaging in numerous acts of mail fraud and/or have devised an overall scheme or artifice to defraud, and are attempting to commit fraud and carry out such scheme in violation of 18 U.S.C. § 1341, which constitute "predicate acts" under

18 U.S.C. § 1961 in furtherance of their campaign to enhance their wealth through unlawful means, including, for example:

- Operating a scheme to defraud by which Defendants seek to sell the Rothschild Patent Portfolio based on unlawful, bad faith, and objectively baseless allegations of patent infringement.  Defendants have no right and no legitimate basis to allege infringement or demand money from QuiBids or any other online penny auction business based upon their use of the "Buy Now" feature.

- As stated herein, beginning at least as early as March 7, 2013,  and continuing to date, Defendants, acting through Carbonneau and Tangible, have communicated to QuiBids and other online penny auction businesses offers to "sell" the Rothschild Patent Portfolio while concealing material information from them that would establish that the '919 and '581 patents are invalid, were obtained through fraud, and are not infringed.  Moreover, in such communications, Carbonneau and Tangible made material misrepresentations, including that the '919 and '581 patents were entitled to a priority date of September 4, 2007, misrepresentations which create the false impression that the prior public uses of the "Buy Now" feature by the online penny auction business is not prior art against the claims of the '919 and '581 patents.  Such omissions and misrepresentations were made in an effort to deprive QuiBids and/or the other online penny auction businesses of money that Defendants had no right to seek or obtain.

- Intending to deceive and defraud, and/or devising a scheme to defraud targets by unlawfully inducing and attempting to induce them to purchase the Rothschild Patent Portfolio for substantial sums to which Defendants are not entitled.

- Mailing or causing the mailing of letters or other electronic communications, repeatedly, separately, such communications containing various false and misleading statements and/or material omissions, and in furtherance of a scheme reasonably calculated to deceive and to defraud QuiBids and the other online penny auction businesses into paying substantial and unjustified sums to acquire the Rothschild Patent Portfolio.

- Causing QuiBids and the other online penny auction businesses to reasonably and detrimentally rely on the false or misleading representations, and/or commissions described above, by causing them to expend significant sums in the investigation, defense, and/or resolution of the false demands and threats made by Carbonneau and Tangible; and Exploiting the foregoing misrepresentations and/or omissions, as well as the associated expense of investigating and defending against them, in order to keep QuiBids and the other online penny auction businesses from discovering the fraud and to thereby obtain and attempt to obtain substantial sums from them.

81.    As alleged herein, Defendants, individually or collectively, and through the conduct of the Associated-in-fact Enterprise, are engaging in numerous acts of wire fraud and/or are devising an overall scheme or artifice to defraud and are attempting to commit fraud and carry out such scheme in violation of 18 U.S.C. §1343, which constitute "predicate acts" under 18 U.S.C. § 1961 in furtherance of their campaign to enhance their wealth through unlawful means, including, for example:

- Operating a scheme to defraud by which Defendants are seeking substantial sums from QuiBids or other online penny auction businesses for the Rothschild Patent

Portfolio based on unlawful, bad faith, and objectively baseless allegations that their respective online penny auctions infringe the claims of the '919 and '581 patents.  Defendants' allegations in combination with their threat to sell the Rothschild Patent Portfolio to other parties who would then be highly motivated to file or threaten to file  objectively baseless patent infringement actions against QuiBids and/or other online penny auction businesses, thereby putting QuiBids and/or other online penny auction businesses in the position of being forced to expend substantial sums of money in defense and/or settlement of such objectively baseless actions.  Neither Defendants nor any third party that might purchase the Rothschild Patent Portfolio have any right or basis on which to allege infringement or demand money from QuiBids or other penny auction businesses on account of their alleged use of the "Buy Now" feature.

- Sending by electronic mail ("email") or causing the emailing of letters or other communications containing various false and misleading statements and/or material omissions, and in furtherance of a scheme reasonably calculated to deceive and to defraud QuiBids and other penny auction businesses into paying substantial sums to acquire the Rothschild Patent Portfolio.

- Communicating by telephone to QuiBids and others in furtherance of a scheme to defraud QuiBids and others into paying substantial and unjustified sums to acquire the Rothschild Patent Portfolio.

- Causing QuiBids and others to expend significant sums in the investigation, defense, and /or resolution of Defendants' baseless and bad faith demands.

- Exploiting the foregoing misrepresentations and/or omissions as well as the associated expense of investigating and defending against them, in order to keep QuiBids and others from discovering the fraud and to thereby obtain and attempt to obtain fees.

82.     As alleged herein, Defendants, individually or collectively, have conducted the affairs of the Associated-in-fact Enterprise through numerous acts of extortion, attempted extortion, and conspiracy to commit extortion in violation of 18 U.S.C. § 1951, which constitute "predicate acts" under 18 U.S.C. § 1961 in furtherance of their overall scheme to defraud and enhance their wealth through improper means, including, for example:

- Obtaining or attempting to obtain substantial sums from QuiBids and others in the penny auction business by wrongful use of fear, including intimidating  QuiBids and others to choose between purchasing the Rothschild Patent Portfolio from Defendants' or to defend expensive legal proceedings and/or undertake costly and burdensome investigation and negotiation procedures; and, threatening to increase the cost of acquiring the Rothschild Patent Portfolio if QuiBids and the other online penny auction businesses fail to comply with Defendants' demands.

- Threatening supposed legitimate enforcement of the '919 and '581 patents  as a tactic of fear and to create undue leverage to extract or to attempt to extract, and conspire to extract substantial sums from QuiBids and others all while knowing that the Rothschild Patent Portfolio are not infringed, are invalid, and unenforceable.

- Preventing QuiBids and other penny auction companies from continuing their use of the "Buy Now" feature which Defendants wrongfully claim is covered by the

'919 and '581 patents and/or causing QuiBids or other online penny auction businesses that use or desire to use the "Buy Now" feature to undertake substantial expenses; and by further using the instrumentalities of interstate commerce (mail and wire) to carry out the pattern of extortion; as alleged herein, based on Defendants' wrongful and inaccurate allegations that the use of the "Buy now" feature in connection with an online penny auction business infringes the '919 and '581 patents.

83.     As alleged herein, Defendants individually and/or collectively, have conducted the affairs of the Associated-in-fact Enterprise through numerous acts using the mail or any facility in interstate commerce in aid of racketeering enterprises in violation of 18 U.S.C. § 1952, which constitute "predicate acts" under 18 U.S.C. § 1961 in furtherance of their overall scheme to defraud and enhance their wealth through improper means, including, for example:

- Mailing of or causing the mailing of, emailing of or causing the emailing of threatening letters in furtherance of a scheme to sell the Rothschild Patent Portfolio for substantial sums of money by wrongful use of fear, including by attempts to intimidate QuiBids and others in the online penny auction business to choose between paying substantial sums for the Rothschild Patent Portfolio that Defendants are not entitled to obtain or to defend expensive legal proceedings and/or undertake costly and burdensome investigation and negotiation procedures if they failed to  comply with Defendants' demands, wherein their threats are objectively baseless and brought with an unlawful motive, without regard to the merits and for an unlawful purpose, and further deprived of legitimacy due to unlawful conduct consisting of fraud or intentional

26

misrepresentations, all while knowing that the '919 and '581 patents are invalid, unenforceable and not infringed.

- Implicitly threatening supposed legitimate enforcement of patent rights as a tactic of fear and to create undue leverage to extract substantial sums from QuiBids and other online auction businesses while knowing that the '919 and '581 patents are invalid, unenforceable, and not infringed.

84.    These predicate acts are related because they had common purposes and goals (such as the unlawful enrichment of Defendants), common methods of commission (for example, the fraudulent use of the emails or wires, and /or misconduct through fear and extortion using the alleged legitimacy of the '919 and '581 patents), and common participants consisting of Carbonneau, Tangible, Rothschild, Ariel, Das, and those acting at their direction.

85.    Each of the foregoing acts of racketeering by the Defendants is related, continuous, ongoing, and part of a pattern of conduct pertaining to multiple patents, directed at multiple victims, and continuing since at least June 28, 2012. Accordingly, Defendants, individually and/or collectively, have engaged and are engaging in a continuing and related pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), which poses a threat of continued unlawful activity. The Defendants' unlawful acts constitute a "pattern of racketeering activity," as that term is defined in 18 U.S.C. § 1961(5), in that there is a threat of continued unlawful activity. With respect to each of the Defendants, the pattern of unlawful activity at least has close-ended continuity in that there at least was a closed period of repeated acts covering at least a period from June 28, 2012 to present. With respect to each of the Defendants, the pattern of unlawful activity also has opened-ended continuity in that the

27

unlawful acts are continuing, including in connection with the ongoing efforts to improperly threaten, mislead, and defraud QuiBids and other online penny auction businesses for the benefit of the Associated-in-fact Enterprise.

86.     As a direct and proximate result of the participation in and conduct of the affairs of the Associated-in-fact Enterprise alleged herein by Defendants through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), QuiBids has been directly and proximately injured in its  business and property, and is entitled to all remedies available under the law.  As an intended, actual, and proximate consequence of Defendants' unlawful actions, QuiBids has incurred significant fees and costs in investigating and defending against Defendants' unlawful conspiracy, including fees and costs with respect to investigating and defending the objectively baseless threats made against QuiBids based on the bad faith allegations of infringement of the '919 and '581 patents, and in addition QuiBids has been forced to incur the costs associated with the significant disruption to its businesses, and other disruptions to QuiBids caused by the Defendants' unlawful conduct.   Moreover, as an unintended, actual, and proximate consequence of Defendants' unlawful actions, Plaintiffs have been further injured commercially and financially by the threat of being sued for infringement of the '919 and '581 patents unless QuiBids purchases the invalid, unenforceable, and non-infringed patents for a substantial sum to which the Defendants have no legitimate basis to demand.

## COUNT II

## <u>VIOLATION OF THE SHERMAN ACT</u>

87.     QuiBids incorporates by reference herein the allegations of the preceding paragraphs.

88.     By virtue of the conduct described above, Defendants have engaged in a conspiracy in an attempt to restrain trade and to acquire and exercise monopoly power in the relevant market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Section 4 of the Clayton Act, 15 U.S.C. § 15(a), authorizes private suits for damages based on violations of the Sherman Act.

89.     Under the law established by *Walker Process,*  382 U.S. 172,  Defendants have violated Section 2 of the Sherman Act by seeking to obtain and maintain market power in the relevant market through bad faith accusations that QuiBids and other operators in online penny auction industry are infringing the '919 and '581 patents which Defendants know to have been procured by fraud.

90.     Ariel's accusation of infringement of the '919 and '581 patents in furtherance of the Defendants' conspiracy is objectively baseless and motivated by a desire to impose a competitive injury on QuiBids and others in the online penny auction market rather than to assert legitimate legally redressable claims of infringement.

91.     Unless restrained, Defendants' unlawful and anticompetitive conduct will cause injury to QuiBids and to the online penny auction as a whole because the loss of the ability to use the "Buy Now" feature will cause QuiBids and others in the market to lose customers.

92.     QuiBids has been required to hire counsel and bring this instant action in order to obtain redress for Defendants' unlawful and anticompetitive conduct.

## COUNT III

## DECLARATORY JUDGMENT OF
## NON-INFRINGEMENT OF THE '919 PATENT

93.     QuiBids incorporates by reference herein the allegations of the preceding paragraphs.

94.     Ariel, through its agents and co-conspirators Carbonneau and Tangible, has accused QuiBids of infringing the claims of the '919 patent.

95.     As a result of such accusations, a valid and justiciable controversy has arisen and exists between QuiBids and Ariel with regard to whether QuiBids infringes one or more claims of the '919 patent.

96.     QuiBids requests a declaratory judgment that QuiBids does not infringe any claims of the '919 patent, together with an award of QuiBids' costs, attorneys' fees and such other relief as this Court deems just and equitable.

## COUNT IV

## DECLARATORY JUDGMENT OF
## INVALIDITY OF THE '919 PATENT

97.     QuiBids incorporates by reference herein the allegations of the preceding paragraphs.

98.     One or more claims of the '919 patent are invalid, at least for failure to comply with the provisions of 35 U.S.C. §§ 102, 103, and/or 112.

99.     QuiBids requests a declaratory judgment that one or more of the claims of the '919 patent are invalid under 35 U.S.C. §§ 102, 103, and/or 112, together with an award of QuiBids' costs, attorneys' fees and such other relief as this Court deems just and equitable.

## COUNT V

## DECLARATORY JUDGMENT OF UNENFORCEABILITY OF THE '919 PATENT DUE TO INEQUITABLE CONDUCT

100.     QuiBids incorporates by reference herein the allegations of the preceding paragraphs.

101.     In connection with the prosecution of the '919 patent, Rothschild and Das knowingly violated 37 C.F.R. § 1.56 with the intent to deceive the USPTO in the following respects:

      (a)     Rothschild and Das filed the application as a "continuation application" of the '703 application with knowledge that the claimed invention was neither disclosed nor claimed in the '703 application; and

      (b)     Rothschild and Das failed to disclose the prior public use of the "Buy Now" feature used by QuiBids and others in the online penny auction industry.

102.     Absent the knowing and intentional conduct of Rothschild and Das the claims of the '919 patent would not have issued.

103.     Wherefore, QuiBids requests a declaratory judgment that the '919 patent be declared unenforceable due to inequitable conduct, together with an award of QuiBids' costs, attorneys' fees, and such other relief as this Court deems just and equitable.

## COUNT VI

## DECLARATORY JUDGMENT OF
## PATENT MISUSE OF THE '919 PATENT

104.    QuiBids incorporates by reference herein the allegations of the preceding paragraphs.

105.    The aforementioned acts of the Defendants constitute patent misuse.

106.    QuiBids seeks a declaratory judgment that Defendants' have been guilty of misuse in connection with their efforts to enforce the '919 patent.

## COUNT VII

## DECLARATORY JUDGMENT OF
## NON-INFRINGEMENT OF THE '581 PATENT

107.    QuiBids incorporates by reference herein the allegations of the preceding paragraphs.

108.    Ariel, through its agents and co-conspirators Carbonneau and Tangible, has accused QuiBids of infringing the claims of the '581 patent

109.    As a result of such accusations, a valid and justiciable controversy has arisen and exists between QuiBids and Ariel with regard to whether QuiBids infringes one or more claims of the '581  patent.

110.    QuiBids requests a declaratory judgment that QuiBids does not infringe any claims of the '581 patent.

### COUNT VIII

### DECLARATORY JUDGMENT OF
### INVALIDITY OF THE '581 PATENT

111.    QuiBids incorporates by reference herein the allegations of the preceding paragraphs.

112.    One or more claims of the '581 patent are invalid, at least for failure to comply with the provisions of 35 U.S.C. §§ 102, 103, and/or 112.

113.    QuiBids requests a declaratory judgment that one or more of the claims of the '581 patent are invalid under 35 U.S.C. §§ 102, 103, and/or 112, together with an award of QuiBids' costs, attorneys' fees and such other relief as this Court deems just and equitable.

### COUNT IX

### DECLARATORY JUDGMENT OF UNENFORCEABILITY
### OF THE '581 PATENT DUE TO INEQUITABLE CONDUCT

114.    QuiBids incorporates by reference herein the allegations of the preceding paragraphs.

115.    In connection with the prosecution of the '581 patent, Rothschild and Das knowingly violated 37 C.F.R. § 1.56 with the intent to deceive the USPTO in the following respects:

> (a)    Rothschild and Das filed the application as a "continuation application" of the '703 application with knowledge that the claimed invention was neither disclosed nor claimed in the '703 application; and

> (b)    Rothschild and Das failed to disclose the prior public use of the "Buy Now" feature used by QuiBids and others in the online penny auction industry.

116.    Absent the knowing and intentional conduct of Rothschild and Das the claims of the '581 patent would not have issued.

117.    Wherefore, QuiBids requests a declaratory judgment that the '581 patent be declared unenforceable due to inequitable conduct, together with an award of QuiBids' costs, attorneys' fees, and such other relief as this Court deems just and equitable.

## COUNT X

## DECLARATORY JUDGMENT OF
## PATENT MISUSE OF THE '581 PATENT

118.    QuiBids incorporates by reference herein the allegations of the preceding paragraphs.

119.    The above mentioned acts of the Defendants constitute patent misuse.

120.    QuiBids seeks a declaratory judgment that Defendants' have been guilty of misuse in connection with their efforts to enforce the '919 patent.

## COUNT XI

## UNFAIR COMPETITION IN
## VIOLATION OF THE LANHAM ACT

121.    QuiBids incorporates by reference herein the allegations of the preceding paragraphs.

122.    The above mentioned acts of the Defendants constitute unfair competition in violation of the Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

123.    Defendants' conduct has caused QuiBids to suffer damages in an amount to be determined.  QuiBids is also entitled to recover punitive damages for Defendants' willful and malicious conduct.

## COUNT XII

### VIOLATON OF THE
### OKLAHOMA ANTITRUST REFORM ACT

124.    QuiBids incorporates by reference herein the allegations of the preceding paragraphs.

125.    The above mentioned acts of the Defendants constitute a violation of the Oklahoma Antitrust Reform Act, 79 Okl. St. § 201, *et seq*.

126.    Defendants' conduct has injured QuiBids in its business and has caused it to suffer damages in an amount to be determined. QuiBids is also entitled appropriate injunctive relief together with the recovery of threefold the damages it has sustained and its costs of this action, including a reasonable attorney fee.

## COUNT XIII

### VIOLATION OF THE
### OKLAHOMA DECEPTIVE TRADE PRACTICES ACT

127.    QuiBids incorporates by reference herein the allegations of the preceding paragraphs.

128.    The aforementioned acts of the Defendants constitute deceptive trade practices in violation of the Oklahoma Deceptive Trade Practices Act, 78 Okl. St. § 51, *et seq*.

129.    Defendants' conduct has caused QuiBids to suffer damages in an amount to be determined. QuiBids is also entitled to appropriate injunctive relief to prohibit further deceptive trade practices by Defendants.

## COUNT XIV

### TORTIOUS INTERFERENCE WITH
### PROSPECTIVE BUSINESS RELATIONS

130.     QuiBids incorporates by reference herein the allegations of the preceding paragraphs.

131.     Defendants knew or should have known of the contractual and economic relations between QuiBids and its customers.

132.     As set forth above, Defendants have in bad faith accused QuiBids of infringing the '919 and '581 patents and have, thereby, knowingly, willfully, and maliciously interfered with the rights of QuiBids to use the "Buy Now" feature in connection with the operation of its online penny auction business.

133.     Defendants' interference was made and continues to be made for an improper purpose and/or through improper means.

134.     Defendants' interference has caused QuiBids to suffer damages in an amount to be determined.  QuiBids is also entitled to recover punitive damages for Defendants' willful and malicious conduct.

### COUNT XV
### UNFAIR COMPETITION IN
### VIOLATION OF OKLAHOMA LAW

135.     QuiBids incorporates by reference herein the allegations of the preceding paragraphs.

136.     The above mentioned acts of the Defendants constitute unfair competition in violation of the common law of the State of Oklahoma.

137.    Defendants' conduct has caused QuiBids to suffer damages in an amount to be determined.  QuiBids is also entitled to recover punitive damages for Defendants' willful and malicious conduct.

## REQUEST FOR RELIEF

WHEREFORE, QuiBids requests that the court enter judgment against Defendants and in favor of QuiBids, decreeing as follows:

(a)    QuiBids is awarded damages as a result of Defendants' violation of the Racketeering Influenced and Corrupt Organizations Act;

(b)    QuiBids is awarded damages as a result of Defendants' violation of the Sherman Act;

(c)    QuiBids is awarded treble damages under the Sherman Act;

(d)    QuiBids is awarded its attorneys' fees and costs under the Sherman Act;

(e)    A declaratory judgment that QuiBids does not infringe the claims of the '919 and '581 patents;

(e)    A declaratory judgment that the '919 and '581 patents are invalid under 35 U.S.C. §§ 102, 103 and/or 112;

(f)    A declaratory judgment that the '919 and '581 patents are unenforceable due to the inequitable conduct of Rothschild and Das;

(g)    A declaratory judgment that Ariel's assertion of the '919 and '581 patents is barred by patent misuse;

(h)    QuiBids is awarded damages as a result of Defendants' violation of the Lanham Act;

(i)      QuiBids is awarded its damages as a result of Defendants' violation of the Oklahoma Antitrust Reform Act, the Oklahoma Deceptive Trade Practices Act, unfair competition, tortious interference with prospective business advantage;

(j)      Entry of a preliminary and permanent injunction against the Defendants and all those in active concert therewith, to prohibit any further actions that constitute a violation of violation of RICO, the Sherman Act, the Lanham Act, the Oklahoma Antitrust Reform Act, the Oklahoma Deceptive Trade Practices Act, unfair competition, tortious interference with prospective business advantage; and

(k)      QuiBids is awarded such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

QuiBids demands a jury trial of all issues so triable.

Respectfully submitted,

Dated:  April 26, 2013                    /s/ Joseph P. Titterington
                                          Joseph P. Titterington (OBA 9033)
                                          DUNLAP CODDING, P.C.
                                          The Film Exchange District
                                          609 W. Sheridan Avenue
                                          Oklahoma City, Oklahoma 73102
                                          Telephone:    405-607-8600
                                          Facsimile:    405-607-8686

                                          **COUNSEL FOR PLAINTIFF
                                          QUIBIDS**